**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE,**
**AT NASHVILLE**

| | |
|---|---|
| **LONNIE STRIPLING,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Jury Demand** |
| ) | |
| **INGRAM BARGE COMPANY, LLC** ) | |
| **d/b/a/ INGRAM BARGE COMPANY,** ) | |
| **Defendant.** ) | |

---

## COMPLAINT

---

Plaintiff, Lonnie Stripling, for her cause of action against the Defendant Ingram Barge Company, LLC d/b/a Ingram Barge Company states and alleges as follows:

## PARTIES

1. Plaintiff Lonnie Stripling is a citizen and resident of Van Buren County, Arkansas and was employed by Defendant Ingram Barge Company, Inc. She began working for Ingram on April 1, 2019. As set forth in more detail herein, Plaintiff performed her job to the satisfaction of the Defendant until she was constructively discharged or removed from her position on or about August 25, 2019 when the Defendant failed to recall her to work.

2. The Defendant Ingram Barge Company, LLC, d/b/a/ Ingram Barge Company (hereafter "Ingram") is an limited liability company formed under the laws of Tennessee. Ingram is headquartered in Davidson County, Tennessee. It's registered agent is Eleanor G. McDonald at 4400 Harding Pike, Nashville, Tennessee 37205. At the time of the events alleged herein, Ingram employed more than 2000 individuals.

## JURISDICTION AND VENUE

3. This complaint concerns the violations of the Jones Act and this Court has federal question jurisdiction over the Jones Act claims pursuant to 46 U.S.C. § 30104, 28 U.S.C. §§ 1331 and 1333.

4. Plaintiff is a resident of Arkansas and the Defendant is headquartered in Nashville, Tennessee, and this Court therefore has diversity jurisdiction because of complete diversity between the parties.

5. This Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367(a) because they are so related to such original jurisdiction and form the same case or controversy under Article III of the United States Constitution.  In addition, Plaintiff's claims alleged herein occurred on navigable waters and bear a significant relationship to traditional maritime activities.

6. This Court also has admiralty jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claim for maintenance and cure because the acts and omissions alleged herein occurred on navigable waterways.

7. The Defendant is headquartered and has its principal place of business in this district, and venue is therefore proper under 46 U.S.C. § 30104(b), and 28 U.S.C. § 1391.  The Court therefore has specific jurisdiction over Plaintiff's claim for maintenance and cure.

## ALLEGATIONS OF FACT

8. Ingram is a company that owns and operates barges and tugs and provides marine transportation services on inland waterways throughout the United States. Ingram primarily utilizes two types of boats to transport materials and freight on rivers throughout the United States.  A "barge" is attached the front portion of the boat that holds the cargo.

"Towboats" are larger boats that push the barges. "Tugs" are smaller than towboats and also push the barges during transport.

9. Each boat has a Captain, which can drive the boat and is ultimately in charge. Each boat has a Pilot, who drives the boat when the Captain is asleep. The Pilot has command of the vessel when the Captain is asleep at such times a Pilot has the same level of authority as a Captain because they are in charge when the Captain is asleep. To become a Captain, an individual must first be a Pilot for over year before obtaining their Master's license (referred to as a Captain's license). Each boat also employs a Mate, who supervises the deck crew. A Mate reports to the Pilot and the Captain, and the deck crew report to the Mate. The Cook and the Engineer report directly to the Captain.

10. Each boat shift consists of 28 days on and four weeks off. Once on the boat, the crew are essentially trapped on the boat. The towboats and barges are so large that they cannot readily pull over or dock on a river to let crew off. There are few ports capable of receiving these large barges for docking. A towboat must disconnect barges in order to dock. A tow consists of multiple barges of massive size that are strung together in a configuration often longer then the Empire State Building in length and height. Barges cannot easily be disconnected for portage.

11. On April 1, 2019, Plaintiff Lonnie Stripling was hired by Ingram as a cook, working full-time aboard the Defendant's vessel as a seaman, and by reason of the said relationship between Plaintiff and Defendant, it was the duty of the Defendant to provide for Plaintiff's safety aboard the said vessel and to maintain the said vessel and its appurtenances in a seaworthy condition.

3

12. Plaintiff's sister, Teresa Christie, was also working as a cook aboard Ingram's vessels. Ms. Christie was hired to work for Ingram in April of 2018. Plaintiff and Ms. Christie spoke to each other regularly after Plaintiff was hired.

13. As a cook, Plaintiff was responsible for cooking meals for the crew of Ingram's barges and maintaining meal logistics as the barges operated on rivers throughout the United States. Plaintiff enjoyed working as a cook and performed her job duties to the satisfaction of her employer.

14. When Plaintiff was transported to her first assignment on the M/V John R. Operle, the Defendant utilized a small skiff to take the crew to board a moving boat. During the transfer, the skiff was nearly sucked under the towboat. After the near-tragedy, Plaintiff found out that the skiff pilot was not properly licensed.

15. Plaintiff quickly discovered that Ingram fostered and tolerated a culture of inappropriate sexual misconduct and sexual discrimination against women. It is discussed and well known amongst Ingram Mariners that years ago, Ingram was in financial distress and was unable to pay its Captains. The Captains that agreed to work without pay for a year became known as "The Untouchables," and Ingram promised that these Captains would always have a job no matter what these Untouchables did or said on or off-duty.

16. Plaintiff and her sister spoke often about the harassment, assault, and discrimination that Ms. Christie also faced at Ingram. However, Plaintiff was hopeful that she would be assigned to a boat with a crew that did not harass, threaten, and discriminate against women, as her sister, Teresa Christie had experienced.

17. Based on her own experience and her conversations with Ms. Christie, it became apparent that Ingram condones a work environment hostile to females and plagued by sexual

4

harassment, discrimination, retaliation, and acts of assault and intimidation toward female seaman.

18. Plaintiff began working on "The M/V Robin B. Ingram," (hereafter "the Robin"), which was a smaller towboat. She preferred the Robin's galley to the galley on the "The M/V John R. Operle," which was a much larger boat. Captain Mark Davidson and Captain "Cat" LNU were in charge of the Robin.

19. Plaintiff's training crew on the Robin informed Plaintiff that the prior cook had a sexual relationship with a crew member. Other crew members brought up the prior cook's sexual relationship and expressed distaste in how she was used. Nonetheless, it was immediately apparent to Plaintiff that females were viewed unfavorably by the Defendant and demeaned as sexual objects and second-class employees.

20. Early on her first assignment, Captain Davidson informed Plaintiff that he was an "Untouchable" and he repeatedly boasted to her that he would never be disciplined for any type of misconduct. Captain Davidson intended, and Plaintiff understood, that his comment was a threat that if she reported any kind of misconduct that nothing would happen to him. Plaintiff also learned that the Defendant had retaliated against other female cooks who had reported sexual harassment.

21. As an example of being an Untouchable, Captain Davidson boasted that he had called an African American member of his crew a "ni\*\*er," and that the crew member claimed Captain Davidson had "held him hostage" on the boat and would not let him leave. Davidson said that Ingram requested that he take a "training class," but that the company housed him in a luxurious hotel accommodation. Capt. Davidson was implying that, because he was an "Untouchable," he had been rewarded and that the "training class" was

5

actually a paid, luxury vacation for him. After attending the training course, Davidson received a certificate which he hung in a frame on the wall of his boat's wheelhouse as a trophy. He told Plaintiff, "I hung that certificate up there so every son-of-a-b\*\*ch in here can see it." When he spoke to Plaintiff, he pointed toward the wall where the certificate was located. To Capt. Davidson, the certificate was a badge of honor and evidence of his status as an Untouchable that he proudly and prominently displayed as a warning to others, including Plaintiff.

22. Capt. Davidson informed Plaintiff that he had to remove the leadman from the Robin because he had threatened to kill one of the mates. Davidson told Plaintiff to stay away from the leadman because he was dangerous. Plaintiff was shocked that Ingram would allow such a dangerous individual to remain employed on its vessel, but did her best to avoid interacting with him. Because of the Defendant's policies, Plaintiff was unable to lock the door to her room despite being required to work in the presence of a dangerous and violent crew member.

23. Capt. Davidson was constantly vulgar around Plaintiff, directed derogatory and sexist comments to her, and physically and verbally intimidated her while she went about her duties as a cook aboard the Defendant's vessel. Capt. Davidson would follow Plaintiff around the boat each day and repeatedly and consistently make inappropriate comments of a sexual nature.

24. Capt. Davidson frequently made derogatory statements about women, including telling Plaintiff that "women are nasty" and that he would never share a bathroom with a woman because they are "nasty." On another occasion, Davidson told Plaintiff that he was even remodeling his house so that he did not have to share a bathroom with his wife because

"women are nasty." Davidson made it clear that he believed women were inferior to men, especially as workers in the maritime industry.

25. Capt. Davidson repeatedly yelled and cussed at the Plaintiff about her own actions, or took his vengeance out on her for others' actions, to the point that Plaintiff felt physically threatened by Davidson's actions and demeaner. He took his anger out on Plaintiff. Other workers aboard the vessel did not suffer Davidson's ire as Plaintiff did. Capt. Davidson targeted and repeatedly demonstrated his anti-female animus toward Plaintiff with sexist and sexual comments uttered for the purpose of mentally and emotionally demeaning Plaintiff while she went about her duties on the boat.

26. Capt. Davidson was required to have surgery on his prostate, which he repeatedly shared with Plaintiff in order to inappropriately discuss his sexual function. He told Plaintiff that he had to use a catheter and could not function sexually while he was recovering, but he emphasized that the doctors assured him *"he would be able to perform" and "get ALL of his faculties back,"* implying that he would be able to have sex again shortly.

27. Upon information and belief, the Defendant knew that, as a result of Capt. Davidson's medical condition or his recovery from the condition, he was unfit for duty and unfit to act as a Captain of the M/V Robin.

28. In the context of Davidson's frequent, unwanted conversations, Capt. Davidson would discuss the prior cook and the sexual relationship she had with another crew member. He compared Plaintiff to the prior cook and said he knew she would end up having sex with a crew mate because she "had no self-confidence." He then told Plaintiff that she also lacked self-confidence. He then discussed the prior cook's physical appearance, stating that she was "pretty, but heavyset." By acclimating Plaintiff to his constant sexual references,

verbal harassment, and physical intimidation, Capt. Davidson was grooming Plaintiff and manipulating her into engaging in sexual activities by abusing, controlling, and isolating Plaintiff.

29. Capt. Davidson constantly and routinely told Plaintiff that he was in charge, even when a Captain who went by the name "Cat" was supposed to be in charge of the vessel during Capt. Davidson's recovery from his surgery. Although he was not actively piloting the boat, Capt. Davidson remained onboard, purportedly to test whether he could handle the rigors of the job after his surgery. Capt. Davidson, Capt. Cat "LNU," and the rest of the crew informed Plaintiff that Davidson was actually the "high captain," meaning that he held the highest authority on the boat at all times and out-ranked all others aboard.

30. Captain Cat reassured plaintiff that he would be her regular captain at some point, and she would only have to deal with Mark Davidson's harassment for approximately a week, when she was scheduled to return for her second hitch. Plaintiff also discussed and reported her fear of Captain Davidson's sexual hostility and harassment to Ingram cook Teresa Christie, Plaintiff's sister.

31. Whenever he was on the boat during the Plaintiff's initial trip on the M/V Robin, Capt. Davidson was constantly in Plaintiff's presence, watching her, and ogling her. When he did so, he had an aggressive grimace on his face and stared at her with a look of perverse pleasure. The corners of his mouth would curl up, making Plaintiff feel remarkably uncomfortable. Capt. Davidson made it clear that he wanted Plaintiff to know that he was looking her up and down in a sexually-suggestive and inappropriate manner.

32. Whether it was because another employee was driving the M/V Robin or Capt. Davidson otherwise was not needed at the helm, he would find Plaintiff and randomly show up in the room she was in to continue ogling her and making inappropriate comments toward her.

33. Davidson would lean on the table on his forearms and turn to where he was looking at Plaintiff while smoking cigarettes. Smoking inside the boat was against Ingram policy, but Capt. Davidson was an Untouchable and arrived early to meals where he would smoke inside the kitchen in order to be near Plaintiff to ogle her and intimidate her.

34. Capt. Davidson told Plaintiff, "I'm the Captain on the boat and I can do whatever I want" while staring at her breasts and smiling. Davidson's conduct occurred everywhere she went on the boat, including the kitchen, the galley, the dining room, and the wheelhouse.

35. During these times, Capt. Davidson repeatedly stated said he was "Untouchable," suggesting to Plaintiff that Ingram would never fire him for sexual harassment and that she was essentially Davidson's captive audience for whatever he wanted to say or do to her.

36. At one point, Plaintiff discussed with Davidson the Ingram Captains who were "Untouchables." Capt. Davidson confirmed that he was one, stating, "Yes. I'm one. They [Ingram] told me."

37. When another member of the crew informed Plaintiff that Capt. Davidson was getting off the M/V Robin, it was a relief for Plaintiff. After Davidson left, Plaintiff remained on the boat for a week.

38. Before she returned for the next tour, Plaintiff asked again if Capt. Davidson would be the Captain on her boat. Plaintiff was informed that he would not be her Captain, and that he would be on another boat. She was informed that she may have to ride with Davidson for a week, but that he would not be in charge for the majority of the schedule.

39. When Plaintiff boarded the boat in August of 2019, however, Davidson was still the Captain. Although Plaintiff was upset at the prospect of having to suffer another week of harassment and abuse, she continued to hope that she would only have to tolerate Davidson for a week and that her situation would improve thereafter. Plaintiff did the best she could to avoid contact with Davidson and hide from him, to no avail.

40. Plaintiff asked the other crew about her concerns, and they encouraged her by saying, "Don't worry, Cat will be back."

41. One of the crew later informed Plaintiff that Capt. Davidson was, in fact, going to be her Captain from that point forward and that Cat would not be back until the last week of the tour. Plaintiff dreaded working with Capt. Davidson, but had no alternative at the time.

42. Plaintiff contemplated ways to hide from Capt. Davidson, but he was the master of the vessel and had total access to all areas of the ship. Plaintiff was also required to go to the wheelhouse to get orders and turn in grocery requests, and contact with Davidson was an inevitable part of her duties as the Defendant's cook. When she would enter the wheelhouse to turn in an order, Davidson constantly stared at her breasts and her buttocks while grinning or smirking in a perverse manner. It was obvious that Davidson had a sexual interest in Plaintiff, and Davidson's intentions were overt.

43. Although it was obvious to Davidson that his leering and sexually-suggestive facial expressions were unwelcome and inappropriate, Plaintiff was compelled to cross her arms over her chest to make sure Davidson knew that his staring at her breasts was not welcome and made her uncomfortable. Davidson knew that his sexual advances were unwelcome, which gave him even more pleasure by making Plaintiff feel uncomfortable and intimidated. After making eye contact with Plaintiff as she crossed her arms or covered

the areas of her body in which he was staring, Davidson would continue staring at her breasts and examining her body up and down, even though her arms were crossed. Capt. Davidson would smirk and guffaw during the process to let Plaintiff know he was aware that she was uncomfortable and that his conduct was unwanted and inappropriate.

*Captain Davidson's Tirade and Assault.*

44. On or about August 22, 2019, Davidson was once again smirking and grimacing at Plaintiff while ogling her. He made sure that no matter what Plaintiff did to try and divert his glances or cover the areas of her body in which he was staring, she could not avoid his ogling, which was both a threat and form of intimidation because of Plaintiff's sex. Plaintiff was also humiliated by Davidson's conduct, which would often occur in the presence of other male crew members. Plaintiff was compelled to make excuses to leave the wheelhouse for her safety, but Capt. Davidson would tell her that he did not like it when people left the room when he had arrived.

45. Plaintiff had placed a large grocery order for the crew, and Nathan Payne, a deckhand, helped her submit the order. Plaintiff continued cooking lunch and organizing the items from the $2,600 order into their proper storage locations while a few members of the crew assisted her.

46. Part of the grocery order included packs of vegetables that were bound together in separate packs of four units. Plaintiff asked her crew member, Nathan Payne, to set the vegetables down in the galley where they would not be a tripping hazard while she finished preparing lunch. She thanked Mr. Payne, and he left. Plaintiff continued preparing lunch and performing her duties as a cook.

47. Once Plaintiff had lunch prepared, a crew member named Hunter claimed that Captain Davidson was going to punish Nathan because he had assisted Plaintiff with the groceries. Hunter claimed that Captain Davidson ordered the crew not to help Plaintiff, which was a part of Davidson's continued harassment, intimidation, and retaliation for Plaintiff avoiding him and his sexual advances.

48. It was widely known among the crew that Plaintiff was attempting to hide from Capt. Davidson and avoid him due to his threats, intimidation, and unwelcomed sexual advances, and that Plaintiff was actively hiding from him on that day.

49. Plaintiff went outside on a part of the boat known as the "deck locker," where a few crew members were congregating. Plaintiff felt safer with other crew members around because they might be able to intervene in the event Capt. Davidson were to assault or intimidate Plaintiff. At one point, Plaintiff looked up and noticed that Capt. Davidson was staring at her through the door with a package of vegetables in his hand. He had opened the pantry door and was glaring at her with rage in his eyes. Plaintiff could see that he was very angry, and she knew that Davidson was targeting her for another round of harassment and intimidation.

50. Plaintiff walked inside while she attempted to steel her nerves for what Davidson might say, threaten, or do to her. She approached and politely asked Davidson what he was doing.

51. Capt. Davidson berated plaintiff with another verbal tirade and yelled, "I'm doing your f**king job!" He continued his tirade for some time while Plaintiff was powerless to defend herself. Davidson continually screamed, cursed, and yelled at Plaintiff at length.

52. During the assault, Davidson was in such close proximity to Plaintiff, he was leaning downward with his face a mere three inches from Plaintiff's. When Plaintiff would back

up to retreat from his assault, Davidson would step toward her and close the distance so he remained within a few inches of her body.

53. Plaintiff was extremely intimidated and threatened by his conduct and realized she had no option but to leave the boat immediately for her safety. Plaintiff had previously worked as a crisis counselor for battered and abused women and knew that abusers like Davidson escalate their behavior before committing a sexual assault. Based on Plaintiff's expertise and observation of Davidson's conduct, she knew that his verbal tirade and assault were a significant escalation and that a physical assault and battery, or sexual assault, was imminent. As Plaintiff's attempts to retreat from Davidson were met by him closing the distance to remain within a few inches of her face, Plaintiff finally exclaimed, "Mark, I don't care what you have to do or who you have to call - get me off this boat!"

54. By yelling and chastising Plaintiff and pursuing Plaintiff to maintain an extremely close distance of only three inches between Plaintiff's face and his own, Captain Davidson intended to create an immediate apprehension of harm in Plaintiff and Plaintiff in fact reasonably feared that it was imminent that Davidson would harm her, thereby constituting the tort of assault.

55. Plaintiff then fled the galley and hid in her room, but she knew that she was trapped on this vessel as it travelled down the Mississippi river and that could not simply stop at a dock to allow her to escape the danger.

56. Davidson pursued Plaintiff and knocked on her door, but she refused to answer. She was alone and could not hear any crew members in the hallway that would be able to assist her if Davidson continued his assault or escalated to physically attacking her.

57. Capt. Davidson repeatedly said, "Lonnie, I need to talk to you." Reluctantly, Plaintiff cracked the door open only far enough to see Davidson and used the door as a barricade and shield between them. Captain Davidson stated "I'm sorry, but you have to understand, I'm different." Davidson made it clear that his supervision of the vessel involved intimidation and harassment to carry out Ingram's business and that his conduct was within those acts he was authorized to do by Ingram as its Captain.

58. Capt. Davidson was much larger than Plaintiff and she was unable to defend herself against him to the disparity of size, his vicious demeanor, and the fact that she is female. She knew that none of the other crew members were around who could help her if he attacked her, and she yelled through the crack in the door that she did not care if he was "different" and that she had to get off the boat.

59. Capt. Davidson continued yelling at her. Plaintiff concluded the interaction by demanding again that she be taken off the boat and closing her door.

60. After Plaintiff finally was able to contact Ingram's dispatcher, she was informed that they would arrange her removal from the towboat. Once she knew that Capt. Davidson had left the hallway outside her room and it was safe to leave her room, she returned to the kitchen to clean up after lunch.

61. Plaintiff's call to dispatch and request to exit the boat were a last resort necessitated by Capt. Davidson's savage disposition that had escalated to the assault on or about August 22, 2019. Plaintiff knew of several other female cooks who had been subjected to retaliation after reporting sexual harassment to Ingram's management, including her sister, Teresa Christie. The Defendant was aware that Plaintiff's sister had reported sexual harassment and would retaliate against her for doing so, as it had done to other female

employees, including Ms. Christie. The Defendant's retaliation and discrimination against female employees was consistent and predictable. It was certain that she would also face retaliation for reporting Davidson's abuse and demanding that she be removed for her safety.

62. Plaintiff had learned from Ms. Christie that the Defendant blacklisted all female employees who reported sexual harassment. Ms. Christie had learned of the Defendant's practice from one of her Captains, John Ambrose. Plaintiff was also aware that the Defendant had specifically ordered crew members to retaliate against Ms. Christie. Plaintiff was aware that Ingram retaliated against Ms. Christie by assigning to the Illinois River, an undesirable work location which Ingram employees refer to as the "sh*t ditch" due to its pollution and stench. Plaintiff was aware that the crew members had retaliated against Ms. Christie by playing the "dildo shopping channel" on the television outside her cabin door all night. On another occasion, Ms. Christie was held against her will in the galley and endured intimidating and even death threats written by the crew on the mirror in her cabin and in the galley. A male employee also balled up his fist and threw a punch at Ms. Christie's face, stopping within an inch of striking her, in addition to other outrageous acts of retaliation and harassment. In a recorded conversation, Ms. Christie was told that she was fired because she had complained about the Defendant's unlawful and discriminatory conduct.

63. On the evening of August 22, 2019, Plaintiff was taken ashore and met with Defendant's Operations Manager, David Franklin, and Human Resources Business Partner, Justin Yott. After a brief interaction, they informed her they would meet again the next morning.

64. On August 23, 2019, Plaintiff met with David Franklin, but he was alone. He informed Plaintiff that her complaint was a "he said she said" situation and there were no witnesses, indicating that they had already completed their sham investigation or considered it closed.

65. Mr. Franklin then told Plaintiff that she "did not have any complaints against her *so far*. We will put you on another boat *and see if you get any there.*" Plaintiff was not the problem, however. Mark Davidson was. By making such comments, Mr. Franklin was announcing that Plaintiff would also receive bogus complaints against her at a new boat as a form of retaliation for reporting Davidson's harassment and demanding her removal from the M/V Robin.

66. Plaintiff had also learned from conversations with her sister that women who reported sexual harassment or hostile work environments would be blacklisted and retaliated against by Ingram's boat crews. Franklin made it clear that Plaintiff would face retaliation after she was transferred to a different boat. Franklin was coercing Plaintiff to refrain from filing any other complaints if she wanted to remain employed at Ingram.

67. Franklin did not inform Plaintiff that she would not face retaliation, that her complaint would remain confidential, or otherwise give her any other indication that she would be safe with another boat crew or that the next boat crew would not be informed that she had complained about Capt. Davidson's sexual harassment. Franklin did not so inform Plaintiff because Ingram has a policy and custom of retaliating against females who complain of harassment, and fully intended to retaliate against Plaintiff. Teresa Christie was informed by an Ingram Captain that Mr. Franklin would not have threatened Plaintiff with bogus complaints after her transfer unless he had been instructed to do so by Ingram. Thus,

Franklin was acting pursuant to Ingram's official policy and custom of retaliating against women who report sexual harassment, intimidation, or assault.

68. Plaintiff had faced intolerable working conditions each day by virtue of the employment of Capt. Davidson, who was unfit for duty and whose savage disposition rendered the M/V Robin unseaworthy. Plaintiff's transfer request was accompanied by the credible threat from Mr. Franklin that she would face retaliation after she were transferred, just like her sister Teresa Christie had faced after she had been transferred after complaining of sexual harassment and assault. In addition, Plaintiff was given no assurance at all from the Defendant that Davidson would be disciplined or that she would not face discrimination, sexual harassment, or retaliation for reporting harassment.

69. After Plaintiff was removed from the M/V Robin, she remained at Ingram's training center over the weekend, cooking for crews on boats that were tied up. She met another female cook named Sam Chapman, who told Plaintiff about the retaliation and harassment that she faced while working for Ingram. Ms. Chapman informed Plaintiff that her Captain engaged in conduct similar to Capt. Davidson, and that he then began putting his hands on her hips when she was working. Ms. Chapman also informed Plaintiff that Ingram would send letters to inform the Captain and crew of the vessel receiving the transferred females and disparage them in retaliation for complaining of misconduct.

70. Given Capt. Davidson's savage disposition, Plaintiff was terrified about the harm she could face if she returned to the river. Ingram had given Plaintiff no assurance that anything would be done to protect her from harm. Based on what had happened to Teresa Christie, including death threats, Plaintiff actually feared for her safety because she could be thrown overboard and nobody would know what had happened to her. Plaintiff called Johnny

Calabrese, her dispatcher, and said, "I'm going home because I can't do this." Calabrese asked, "So, are you quitting?" Plaintiff responded, "yes, I can't do this."

71. As Plaintiff was driving home in her rental car, she received a call from Eleanor McDonald, Ingram's general counsel, who was returning the call that Plaintiff had placed to Ingram's "ethics hotline." Plaintiff informed Ms. McDonald about her conversation with Calabrese. McDonald said that she had several meetings she needed to attend, but would call her back. Their conversation was not long, but McDonald said she was going to make some calls and see if she could "get to the bottom of it. She told Plaintiff, "I will circle back around with you."

72. Based on her conversation with McDonald, the Defendant lead Plaintiff to believe that Ingram would address the harassment and allow her to return to work on an assignment that was safe and on a vessel that was seaworthy. However, the Defendant never called Plaintiff back to return to duty, never arranged for medical treatment or counseling, and never paid her maintenance and cure.

73. The Defendant never informed Plaintiff's crew that she would not return to duty. Plaintiff received messages from her crew that they never heard from anybody at Ingram about her complaint or the status of her employment and prospect for returning to duty. It was apparent that Ingram never interviewed any of the crew about what had occurred onboard.

74. Defendant Ingram's culture of discrimination and sexual harassment toward female employees is so pervasive and toxic that reports of harassment and intimidation from female employees are treated by Ingram as a badge honor or a rite of passage for its male employees. Male harassers are not only immune from discipline, they are promoted as a reward for harassing women.

75. The Defendant knew about its harassment and discrimination against women, and, in fact, intended it. The Defendant had specifically instructed employees to harass and retaliate against other female cooks who had reported sexual harassment, including Teresa Christie. Because the harassment of Plaintiff was pervasive, knowledge of it is imputed to her employer.

76. Because the Defendant condones the harassment and assault of employees like Plaintiff at the hands of Ingram's Captains, the Defendant is vicariously liable for Davidson's conduct. The Defendant did not even interview male employees before dismissing plaintiff's complaint as a mere "he said – she said" scenario. If there was an investigation conducted, it was a sham investigation to conceal the truth of what had happened to Plaintiff and avoid its obligation to pay maintenance and cure for Plaintiff's injuries.

77. Ingram failed to provide any reassignment opportunities to Plaintiff, but never informed her of the status of Eleanor McDonald's investigation, or that they accepted her resignation or considered her separated from employment.

78. Teresa Christie informed Plaintiff that she had learned from a former Ingram employee that Ingram threatens and coerces employees to lie during investigations, including sexual harassment investigations. Ingram's coercion and intimidation included repeated "reminders" that the employees worked for Ingram and that the employees needed to remember where they worked and who paid them. Plaintiff and Teresa Christie learned that Ingram has a history of threatening and retaliating against employees who fail to "walk the company line." For example, Ms. Christie learned from a former male employee that Ingram required employees to fill out false witness reports in an accident investigation. Although Ingram represented the employees were "witnesses," Ingram knew its employees

were not actually present, but submitted the false witness statements to reduce or avoid liability in that case.

79. Plaintiff subsequently contacted the cook who previously worked on the M/V Robin, and discovered that Capt. Davidson would also stare at her breasts and ogle her, causing her to use her arms to block him from staring at her breasts. The prior cook had even told Capt. Davidson that her "eyes are eight inches [above her breasts]" so that he would stop, but he did not. The prior cook confirmed that Capt. Davidson was "creepy and hateful." Plaintiff stated that she did not understand why Ingram would not do anything about the discrimination, and the prior cook stated that she did not understand it, either. Ingram's policy of retaliation and failure to redress its discriminatory and retaliatory conduct against female employees has gone on for years and possibly decades.

80. The Defendant's unlawful course of conduct caused Plaintiff severe emotional distress, which resulted in her requiring medical and mental health treatment. Plaintiff experienced and continues to experience nervousness, insomnia, fear of being around others, and was ultimately diagnosed with PTSD caused by the Defendant's harassment and assault of Plaintiff, which condition is chronic and likely to continue into the future until it is cured with treatment and medication. Plaintiff is required to take medications because of the trauma she experienced while employed by the Defendant. Her treatment and therapy continues to this day.

## CAUSES OF ACTION

## COUNT I: MAINTENANCE AND CURE

81. Maintenance and cure are implied provisions in contract between semen and shipowners.

82. The Defendant ship owner has an ancient obligation of care for a seaman injured during the course of maritime employment. This obligation includes payment for any injury or illness that manifests itself while employed, regardless of origin and whether it pre-existed a seaman's employment.

83. Maintenance and cure are due regardless of the cause of the seaman's injuries, regardless of whether the shipowner was at fault, and regardless of whether the Defendant's vessel was unseaworthy.

84. The doctrine of maintenance requires a shipowner to provide an injured or ill seaman with food and lodging during the seaman's service on the ship while the doctrine of cure obligates the shipowner to provide necessary medical care and attention.

85. As a seaman, Plaintiff was entitled to maximum medical cure for her emotional and psychological injuries incurred aboard the Defendant's vessel as a result of the harassment and assault of Plaintiff by its Captain which is reached when she recovers from the injuries, the condition permanently stabilizes or cannot be improved further.

86. The Defendant was aware of its obligation to pay maintenance and cure, and had previously paid Plaintiff approximately $560 in maintenance and cure after she sustained a concussion while working on the M/V John R. Operle. The payment of $560 was, upon information and belief, approximately half of what Ingram paid a male deckhand for maintenance and cure.

87. The Defendant was aware of Capt. Davidson's assault after conducting its sham investigation, and knew or should have known that Plaintiff had suffered mental and emotional trauma because of Davidson's actions, but failed to pay maintenance or cure.

88. The Defendant failed to pay Plaintiff her maintenance and cure from the period of time after her departure the M/V Robin on or about August 23, 2019. To date, the Defendant has failed to pay Plaintiff any maintenance or cure for treatment of her injuries or her wages due.

89. The Defendant's duty to provide maintenance and cure is without regard to fault, and negligence and causation are therefore not relevant. As a result, Plaintiff is entitled to maintenance and cure for injuries she received while in the service of her ship owned by her employer, Ingram Barge, which entitlement is independent of any other claims she has brought.

## COUNT II: NEGLIGENCE

## JONES ACT

90. Plaintiff's negligence claims are brought pursuant to Section 33 of the Merchant Marine Act of 1919, commonly known as the Jones Act, and all statutes amendatory thereof and supplementary thereto.

91. Plaintiff was employed by the Defendant as a member of the crew of its vessel, the M/V Robin, in the capacity of a cook and was a member of said crew and engaged in the furtherance of its duties and the interests of the Defendant.

92. It was the obligation and duty of the Defendant to furnish Plaintiff with an adequate number of officers and co-employees and Master and other officers, to furnish plaintiff with a safe place in which to do her work, to supply her with suitable and safe means, materials, and appliances in and for the performance of her work, to maintain the same in proper condition for the proper performance of the said work, to promulgate and enforce proper rules in relation to the foregoing, and to inspect the aforesaid materials, appliances, and means, to

provide Plaintiff with a safe and seaworthy vessel, and to warn Plaintiff of the dangers to be encountered in the performance of her work.

93. After her assignment to the M/V Robin, Plaintiff was constantly harassed, belittled, intimidated, and targeted by the Defendant's Captain, which included sexual harassment.

94. In August of 2019, Capt. Davidson's pattern of harassment culminated in Capt. Davidson punishing and retaliating against Plaintiff while she was working to cook meals and stow groceries away. Plaintiff first left the kitchen and attempted to hide from Capt. Davidson on the deck locker in the presence of other crew. Capt. Davidson was enraged by the manner in which Plaintiff had stowed vegetables and summoned Plaintiff back inside, whereupon Capt. Davidson berated and chastised Plaintiff, cursing and screaming at her and causing Plaintiff to be placed in immediate apprehension that she would be physically harmed. Plaintiff was extremely intimidated and threatened by Davidson's verbal tired and his physical presence and manner of aggression, that she felt compelled to leave the boat immediately for her safety. Plaintiff informed Capt. Davidson that she needed to leave the boat, and returned to her room to hide from Davidson. Davidson followed her to her room, and remained outside while attempting to coerce Plaintiff out while Plaintiff repeatedly demanded that she be allowed to leave the boat.

95. After some time, Davidson left the area outside Plaintiff's room, and she felt safe to return to the kitchen to clean up after lunch. She was ultimately able to contact dispatch and exit the boat as a last resort for her safety.

96. The Defendant, through the acts of Capt. Davidson, breached the duties of care it owed Plaintiff.

97. The Defendant's standard of causation applies under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60, and causation is satisfied if the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury, *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500 (1957), which is often referred to as the "featherweight causation standard."

98. The Defendant's breach of its duties were the cause in fact and the proximate cause of Plaintiff's psychological and emotional injuries, which harms were foreseeable to the Defendant.

99. As a direct and proximate result of Capt. Davidson's harassment and the assault he committed that caused Plaintiff to flee the M/V Robin, Plaintiff experienced severe emotional and psychological distress and was diagnosed with PTSD.

100.    Plaintiff was acting within the scope of her employment and in the interests of the Defendant herein, and she was injured by the carelessness and negligence of the Defendant, its officers, agents, and employees for whom the Defendant was responsible, and in violation of the aforesaid duties and obligations, without any fault or negligence upon the part of the Plaintiff.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## JONES ACT

101.    Plaintiff incorporates by reference the allegations under Count II as if fully set forth herein.

102.    Capt. Davidson's conduct, including his continuous harassment of Plaintiff and the assault he committed against her in August of 2019, was intentional and reckless, so

outrageous that it is not tolerated by civilized society, and resulted in serious mental injuries to the Plaintiff.

103.    As the Captain of the Defendant's vessel, Davidson was Plaintiff's superior officer and had authority and acted on behalf in furtherance of the interests of his employer. Capt. Davidson's harassment and assault occurred as a result of anger over matters directly related to his exercise of control over Plaintiff and was based on authority delegated to Capt. Davidson, as the master of the ship, in the discharge of duties with which Davidson had been charged by the Defendant.

104.    Under FELA, the Defendant's intentional infliction of emotional distress was committed in furtherance of the Defendant employer's objectives, or, in the alternative, the intentional tort was the product of the Defendant's negligence in hiring, supervising, or failing to fire Capt. Davidson.

105.    The Defendant is liable under the doctrine of *respondeat superior* for the intentional infliction of emotional distress Davidson caused during his assault of Plaintiff, an inferior, which acts Davidson committed in the prosecution of the ship's work.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## JONES ACT

106.    Plaintiff incorporates by reference the allegations set forth in Count II and Count III as if they were fully stated herein.

107.    The Defendant subjected Plaintiff to emotional harm within the zone of danger created by the conduct of the Defendant's Captain, Mark Davidson, who assaulted Plaintiff and forced her to flee the M/V Robin for her safety.

108.	The Defendant placed Plaintiff in immediate risk of physical harm by the conduct of the Defendant's Captain, Mark Davidson.

109.	Plaintiff was within the zone of danger and suffered emotional distress from the fright caused by the actions of the Defendant.

110.	Capt. Davidson placed Plaintiff in the zone of danger and within immediate apprehension of physical harm when he attacked and assaulted Plaintiff, which was because of his view that she was not performing her duties as a cook adequately and in accordance with his wishes, and his assault was therefore made and intended by Davidson to be furthering the interests of his employer.

111.	As a direct and proximate result of the Defendant's conduct, Plaintiff is entitled to recover for emotional injuries under a theory of negligent infliction of emotional distress.

## COUNT V:  NEGLIGENT HIRING, RETENTION AND/OR SUPERVISION
## JONES ACT

112.	Plaintiff incorporates by reference the allegations set forth in Count II, Count III, and Count IV, as if they were fully stated herein.

113.	The Defendant owed Plaintiff a duty of care to protect its employees from people with known and dangerous propensities, such as its Captain, Mark Davidson.

114.	The Defendant knew or had notice of Capt. Davidson's propensity to commit wrongful acts, including the wrongful acts, harassment and assault of Plaintiff.

115.	The Defendant knew or should have known that Capt. Davidson was unfit for his position, unfit to act as the Captain of the M/V Robin, and that his conduct could lead employees like Plaintiff to suffer severe emotional distress from his conduct.

116.     The Defendant had the authority to prevent the harm to Plaintiff caused by Capt. Davidson.

117.     Capt. Davidson is incompetent or unfit to perform the job and the Defendant had actual or constructive knowledge of Capt. Davidson's propensities.

118.     The Defendant failed to act or discipline Capt. Davidson, terminate him, or otherwise supervise him in a manner that would have tamed his propensities, and the Defendant's failures caused Plaintiff's injuries because she was forced to remain under the supervision of Capt. Davidson.

119.     As a direct and proximate result of the Defendant's negligent hiring, retention and/or supervision of Capt. Davidson, Plaintiff has been injured and the Defendant is liable.

## COUNT VI:  ASSAULT

## JONES ACT

120.     On or about August 22, 2019, Capt. Davidson berated Plaintiff during a verbal tirade over her work in the kitchen and the manner in which she had stored food therein, continually screaming cursing, and yelling at Plaintiff at length, as alleged herein.

121.     Capt. Davidson's inappropriate behavior was a significant escalation that Plaintiff reasonably believed would lead to further assault, battery, or sexual assault, and caused Plaintiff to flee to her room to hide from Davidson and protect herself from his conduct. Capt. Davidson followed Plaintiff to her room and remained outside to attempt to coax her outside into the hallway, while she continued to use the door as a shield for her safety.

122.     Capt. Davidson was larger and stronger than Plaintiff and held a disparity of force over Plaintiff, who is female.  He harassed and assaulted Plaintiff with the intent of creating an apprehension of harm.

123. During his tirade and his pursuit of Plaintiff, Capt. Davidson intentionally or knowingly caused Plaintiff to reasonably fear imminent bodily injury or harm.

124. Capt. Davidson's assault was committed in the discharge of his duties and in furtherance of the work of his employer's business.

125. In the alternative, Capt. Davidson is a person known to the Defendant as having a vicious character, and the Defendant shipowner knew or should have known of Capt. Davidson's violent propensities.

126. The Defendant had a duty to make reasonable provision against the intentional and malicious conduct of Capt. Davidson.

## COUNT VI:  BREACH OF WARRANTY OF SEAWORTHINESS

127. A shipowner owes an absolute, nondelegable duty to provide a seaworthy vessel to seaman employed on the shipowner's vessels.

128. A ship is unseaworthy by reason of defective personnel.

129. The shipowner warrants that his ship is seaworthy to the extent that the members of the crew are of a disposition common to the ordinary men in the calling.  The seaman, in a sense, accepts the risk of encountering crewmembers whose disposition may be more irascible than his own but which cannot be deemed so savage that shipboard life becomes a menace.

130. The shipowner's liability for breach of the warranty of seaworthiness does not depend upon the existence of notice or prior knowledge by the shipowner of its crewmember's vicious disposition.

131. Capt. Davidson possessed an exceptionally quarrelsome nature, a severe personality disorder, or a similar flaw sufficient to establish his savage and vicious

disposition. Davidson lashed out at Plaintiff without provocation and outside the ordinary degree of temperament required of a seaman.

132.     Applied to a seaman, such a warranty is that she is equal in disposition and seamanship to the ordinary men in the calling. The Defendant breached the absolute, nondelegable duty to provide a seaworthy vessel by employing defective personnel.

133.     The Defendant's vessel, the M/V Robin, was unseaworthy due to defective personnel and the Defendant's employment of Mark Davidson as its Captain.

134.     The Plaintiff's injuries were caused by the condition of the Defendant's ship and involved repeated acts of an aggravated character demonstrating that, during the time leading up to Capt. Davidson's assaults on Plaintiff, the Defendant's ship was in an unseaworthy condition because of the presence of the assailant, Mark Davidson, who was also unfit for duty.

135.     The temperament of Capt. Davidson was severely impaired, causing the Defendant's ship to become a perilous place, thereby violating the warranty of seaworthiness.

136.     Capt. Davidson's temperament and abilities were not equal in disposition and seamanship to the ordinary men in the calling.

137.     Capt. Davidson's behavior was not within the usual and customary standards of the calling.

138.     Capt. Davidson held a wicked disposition, a propensity to evil conduct and/or had a savage and vicious nature.

139.     Plaintiff was the victim of Capt. Davidson's wicked disposition, propensity for evil conduct and/or his savage and vicious nature, resulting in the Defendant's vessel becoming

a perilous place that culminated with Plaintiff fleeing the galley for her safety and barricading herself in her quarters to hide from Capt. Davidson. In furtherance of his misconduct, Capt. Davidson followed Plaintiff to her room and waited outside her room, taking action to coax her to open the door and avail herself of his further, savage, conduct.

140.    Plaintiff was forced to flee the M/V Robin for her safety due to the Defendant's breach of the warranty of seaworthiness, which caused Plaintiff's emotional and psychological injuries.

## DAMAGES

141.    Plaintiff brings this suit for all damages recoverable at law or equity, including, without limitation, maintenance and cure, damages for personal injury, mental anguish, emotional distress, psychological injury, loss of enjoyment of life past and future, lost wages past and future, impairment of Plaintiff's capacity to earn income and for any and all medical expenses which are reasonable and necessary and made necessary by the acts and omissions of the Defendant.

## PUNITIVE DAMAGES

142.    By virtue of the Defendant's intentional, malicious, and reckless conduct, including its willful refusal and failure to pay maintenance and cure, Plaintiff is entitled to an award of punitive sufficient to deter the Defendant and others from like conduct.

## PRAYER FOR RELIEF

WHEREFORE, Premises Considered, Plaintiff prays:

1. That process issue, requiring the Defendant to answer in the time prescribed by law.

2. That Plaintiff be awarded judgment from and against the Defendant for failure to pay her maintenance and cure for injuries received aboard the Defendant's vessel;

3. That Plaintiff be awarded a judgment from and against the Defendant for actual and compensatory damages in an amount in accordance with the proof;

4. That the Court find that the Defendant was negligent under the Jones Act and award Plaintiff damages under her theories of negligence, negligent infliction of emotional distress, and negligent hiring, retention, and supervision;

5. That the Court find that the Defendant is liable under the Jones Act for Plaintiff's claims of assault and intentional infliction of emotional distress;

6. That this Court find that the Defendant's vessel was unseaworthy and award Plaintiff damages for the Defendant's breach of the warranty of seaworthiness;

7. That Plaintiff be awarded her court costs and discretionary costs in this matter;

8. That Plaintiff be awarded attorney's fees and costs available at law or in equity;

9. For such other, general relief to which the Plaintiff is entitled.

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

THE BLACKBURN FIRM, PLLC

_/s/ Bryant Kroll_
W. Gary Blackburn (#3484)
Bryant Kroll (#33394)
213 Rep. John Lewis Way North, Suite 300
Nashville, TN 37219
P: (615) 254-7770
F: (866) 895-7272
gblackburn@wgaryblackburn.com
bkroll@wgaryblackburn.com
*Attorneys for Plaintiff Lonnie Stripling*